IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## ALPHONSO BRADFORD v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 95-A-491     J. Randall Wyatt, Jr., Judge**

---

### No. M1998-00078-CCA-MR3-PC - Decided May 5, 2000

---

The petitioner has appealed the denial of his petition for post-conviction relief. He was indicted by the Davidson County Grand Jury for first degree murder and entered a guilty plea to second degree murder, receiving a sentence of sixty years as a Range III offender. In his post-conviction petition, the petitioner alleged that his counsel was ineffective and his plea was coerced. After a hearing on the post-conviction petition, the trial court denied relief on November 20, 1996. The petitioner filed a notice of appeal on January 14, 1999, pursuant to an order of this court allowing a delayed appeal to be filed. We affirm the trial court's denial of the petitioner's post-conviction petition.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

GLENN, J., delivered the opinion of the court, in which RILEY, J., and WITT, J., joined.

Thomas H. Potter, Nashville, Tennessee, for the appellant, Alphonso Bradford.

Paul G. Summers, Attorney General and Reporter, Elizabeth T. Ryan, Assistant Attorney General, Victor S. Johnson, III, District Attorney General, and Katrin Novak Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The petitioner, Alphonso Bradford, appeals as of right from the trial court's denial of his petition for post-conviction relief on November 20, 1996. On September 12, 1995, the petitioner, who had been charged with first degree murder, entered a guilty plea to second degree murder with a waiver of the applicable sentencing range. Pursuant to the plea agreement, the trial court sentenced him as a Range III offender to sixty years at forty-five percent, rather than the applicable Range II sentence of forty years maximum. On May 29, 1996, the petitioner filed a *pro se* petition for post-conviction relief. In this petition, he alleged that his trial attorneys violated his right to effective counsel in obtaining his plea, because they pressured him to accept the plea through his mother and sister. After counsel was appointed to represent the petitioner on appeal, an amended post-conviction petition was filed. In addition to the coercion allegations in the *pro se* petition, the amended petition alleged ineffective assistance of counsel in that his attorneys did not adequately

investigate his case and did not explain sentencing law to the petitioner. The coercion used on him and his ignorance of sentencing law or other alternatives caused him to enter a plea that was not voluntary or knowing. After a hearing on the petition, the trial court denied the petitioner's request for relief.

The petitioner appealed to this court on two issues:

(1) Whether the petitioner's guilty plea was entered voluntarily; and
(2) Whether the petitioner was denied effective assistance of counsel.

After a careful review of the record, we affirm the judgment of the trial court in denying the petitioner's petition for post-conviction relief.

**FACTS**

The petitioner's petition for post-conviction relief was heard on November 6, 1996. The petitioner's mother, Tommie Bradford, was the first witness called on behalf of the defense. She recalled discussing her son's case with Ms. Tucker and an African-American man[1] from the Public Defender's Office during the time the case was being prepared for trial. Ms. Bradford had just been released from the hospital after treatment for a severe nervous condition and was taking eleven different medications. She testified that the public defenders talked to her at her home about the shooting and asked for names of any witnesses. The attorneys also spoke with Ms. Bradford and her three daughters on another occasion at the Public Defender's Office. During this interview, Ms. Bradford testified that they were asked about the petitioner's upbringing and the shooting incident. The public defenders told the family that they could not find any witnesses, and Dickerson told her that he had been unsuccessful in getting the individuals, whose names he had been given, to answer their doors. When Ms. Bradford was told that her son would probably receive life without parole from a jury, it upset her so much that she was subsequently hospitalized on the verge of a nervous breakdown. She stated that the attorneys knew she was ill. They told her that her son could get forty-five years at twenty-five percent in a plea agreement.

On the day the petitioner entered his plea to second degree murder, Ms. Bradford and her daughters went to see the petitioner because they were told he was upset. She testified that he was very emotional. She told the petitioner, in the presence of her daughters, that he would get life without parole if he went in front of a jury, but the attorneys had told her that he could "cop out" and get forty-five years at twenty-five percent, which she thought was better. Ms. Bradford stated that her daughters supported her in this. She testified that she later found out her son's plea was for sixty

---

[1]This man was identified as Tim Dickerson, an investigator for the Public Defender's Office. Ms. Bradford also testified that a "little red-headed lady" may have been present. She was not sure, due to all of the medication that she was taking. This lady was later identified by Public Defender Karl Dean as Deidre Murray, a law clerk who worked on the defense team.

or sixty-five years at forty-five percent, and, if she had known that, she would never have suggested that the petitioner accept it.

On cross-examination, Ms. Bradford stated that the attorneys talked to her about the fact that her son had talked to the victim, then left the scene and came back with a large caliber rifle. The victim was fatally shot three times. The attorneys also told Ms. Bradford that some bullets were found at the scene. She was convinced that the victim had a gun, because he was a noted drug dealer and carried a gun. However, she admitted that no one ever told her that the victim had a gun. She remembered that her son had three attorneys, Mr. Dean, David Siegel, and Ms. Tucker, and the attorneys told her that the State could file a notice of the death penalty.

The petitioner testified next on behalf of his petition. He testified that his attorneys came to the justice center on a Friday or Saturday to talk to him about the district attorney's offer of a sentence of sixty years at forty-five percent for second degree murder. At first, the petitioner was not going to accept the deal. He testified that he asked his attorneys why he was not getting fifteen to twenty-five years at thirty-five percent, since that was the sentence for second degree murder with one prior felony. The petitioner admitted that his prior felony was also for second degree murder. He stated that his attorneys talked to him about waiving the sentencing hearing, but he did not know anything about the law at that time. Since then, he has been studying the law books at the prison and has subsequently learned that a Range III offender was out of his category. According to the petitioner, his attorneys explained why his sentence was being enhanced to a Range III offender, based on the fact that this charge was the same as his previous conviction. Although the petitioner told his attorneys that he understood this, he really did not understand what was meant by enhancement, because "I wasn't really in my state of mind."

The petitioner testified that, on the day his plea was entered, he was "going off upstairs and down in that little room." During a visit from his mother and sisters, the petitioner stated that his mother told him, "Baby, 60 years is better than life without parole. You will be able to get out again." He stated that his mother was telling him to take the deal, but he wanted to take his chances at trial, "because what's life if I got 60 years at 45 percent?" The petitioner testified that his attorneys explained the sentencing law to him and that he asked questions but did not understand all of the answers they gave him. He admitted, however, that he never brought his lack of understanding to his attorneys' attention. He stated that he never waived his attorney-client privilege to allow his attorneys to speak to anyone else about his case. The petitioner testified that he had confidence in his attorneys' ability to prepare his case but thought they should have gotten him a better sentence.

On cross-examination, the petitioner stated that the victim shot at him first. At first, the petitioner denied that he shot the victim three times but then admitted it. He also admitted that his attorneys discussed with him the possibility that the State could use his previous conviction for second degree murder to seek the death penalty in this case. In addition, the attorneys discussed the possibility of his receiving life without parole. The petitioner testified that his attorneys did not coerce him through his family into pleading guilty. According to the petitioner, his mother did not

-3-

talk him into accepting the deal, and it was not a decision that he made himself. When asked who made the decision for him to plead guilty, the petitioner replied, "I don't know."

The prosecutor showed the petitioner his plea agreement signed by him on September 9, 1995, three days before he entered his plea. The petitioner testified that he signed the agreement on that day but told his attorneys that he may not take it. He admitted he knew before his attorneys talked to him about sentencing that he would never make parole on a life sentence. The petitioner admitted he was also somewhat familiar with the criminal justice system from his prior incarceration for second degree murder. When asked about the allegations in his petition that the attorneys did not properly pursue his defense, the petitioner testified that his attorneys did not do anything to bring up the victim's violent past, involving murder, assault, and weapons charges, or to bring up information about a nine millimeter shell found at the scene. He stated that the attorneys told him the victim's past was irrelevant to his case but admitted that he did not know if they investigated those issues or not.

After the defense rested its case, the State called Karl Dean, Public Defender for Davidson County, as its only witness. Dean testified that he had been involved with over fifty murder cases and was actively involved in the petitioner's case. He became involved in the case, because there was a real possibility that the State would seek the death penalty or life without parole for the petitioner. As a result, the defense team of three attorneys, Mr. Dean, Mr. Siegel, Ms. Tucker; a law clerk, Deidre Murray;[2] and an investigator, Tim Dickerson, were involved in preparing the defense. Even before the State filed a notice of its intent to seek life without parole, the team had already begun to investigate the petitioner's background. Dean recalled that both the petitioner and his family mentioned that the victim, David Collins, had previously shot and killed someone, but a search for unserved warrants, criminal records, and the like revealed nothing to substantiate the family's allegations. Although some shell casings were found at the scene of the shooting which did not match the petitioner's rifle, an investigation by the attorneys could not produce any evidence that the victim had a gun when he was shot by the petitioner.

The public defender's time sheets reflected that either Dean or Seigel and Tucker had a conversation with the prosecutor on September 6, 1995, and on September 7, they met with the prosecutor. On September 8, the State made an offer of sixty years at forty-five percent, which the defense team took to the petitioner on the same day. Dean recalled that the attorneys went over everything with the petitioner and told him to think about it. They went back to see him the next day, September 9, at which time the petitioner signed the agreement. The plea was entered on September 12, 1995. According to Dean, Siegel was very thorough about going over sentencing issues and was somewhat of an expert on the issue of pleading out of the sentencing range. There was a chart in the petitioner's file that set out all of the sentencing ranges. Dean testified that, although the team went over the reasons why the plea was being done this way, the petitioner's position was always that he should receive less time for his crime. Dean denied coercing the

_____

[2]Ms. Murray was the "little red-headed lady" that the petitioner's mother referred to in her testimony.

-4-

petitioner's plea through the use of his mother's health; nor did the petitioner tell him that he felt coerced in any way. He also stated that the likelihood that the petitioner would get life without parole from a jury was substantial. Dean remembered meeting with the petitioner's family at least two times.

On cross-examination, Dean recalled that a witness at the preliminary hearing named Andrew Harris testified that he saw the victim being shot as he was attempting to crawl away from the petitioner. Dean's office interviewed another witness, who worked in a store. According to Dean, the information from this witness was damaging to the defense. A third witness, a pregnant woman, gave a taped statement, but Dean could not remember the substance of her statement. He stated that, to the best of his knowledge, all witnesses were identified and interviewed, but he could not be absolutely sure. Although Dean did not have a specific recollection of going over possible sentences with the family, he could not imagine that this was not done, because the defense team was working on the sentencing phase and mitigating evidence at the time. When asked if members of the team would have tried to convince the family that the petitioner would be better off if he pled guilty, Dean explained that the attorneys and possibly Dickerson would have given their opinions if asked. Dean was present when sentencing ranges were explained to the petitioner, although he felt like Siegel probably did most of the talking. It was also the usual practice in his office to read the plea agreement to the petitioner. It was Dean's opinion that the petitioner definitely understood the plea when he signed it. During the three days between the signing of the plea agreement and when the plea was entered, Dean's office received no communication from the petitioner.

The witness testified that the defense team was aware of Ms. Bradford's health problems and her fear of testifying at trial. On the day the plea was entered, September 12, Dean recalled that Ms. Bradford and the family arrived after the proceedings had begun, that they spoke with the petitioner, and that the plea went forward without any holdups or outbursts from the petitioner. Dean did not recall any outbursts from the petitioner's holding cell that day and testified that the petitioner was not in a highly agitated emotional state.

The State rested its case. The judge then took the petition under advisement and issued his opinion denying the petition on November 20, 1996.

**STANDARD OF REVIEW**

Because the petitioner filed his *pro se* petition on May 29, 1996, it is governed by the 1995 Post-Conviction Procedure Act. At the evidentiary hearing, the defendant bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App.), perm. app. denied (Tenn. 1998). Clear and convincing evidence means that there is "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks, 983 S.W.2d at 245 (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). On appeal, we are bound by the trial court's findings of fact unless the record preponderates against those findings. Hicks, 983 S.W.2d at 245. Issues of ineffective assistance of counsel and the possibility of prejudice to the defense are mixed questions

of law and fact, meaning that appellate review of such issues is *de novo*. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999) (citing Goad v. State, 938 S.W.2d 363 (Tenn. 1996).

## ANALYSIS
## I.
## Guilty Plea

The petitioner alleges that his guilty plea was obtained as a result of the coercion of his attorneys, who used his family to convince him to take the prosecutor's offer. After a review of the record, we conclude that the evidence does not preponderate against the trial court's finding that the petitioner's plea was voluntary and knowing, and we, therefore, affirm.

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. Boykin, 395 U.S. at 242. Similarly, our Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and it consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904.

Since the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05. If a plea is found to have been knowing and voluntary, the defendant waives any challenge of the offender classification or release eligibility. Pettus, 986 S.W.2d at 543.

A review of the transcripts of the plea proceedings and the post-conviction hearing reveals that the petitioner's plea was knowing and voluntary. At the time the petitioner entered his plea on September 12, 1995, the trial court took great care to go through the terms of the plea agreement with the petitioner, including the fact that he was pleading out of range, and explained to him the rights he was waiving by entering a plea. In addition, the judge questioned Dean to make sure that the petitioner's plea was his own decision and that he understood that he was pleading out of his

range. The trial court complied with the mandates of Rule 11 in determining that the plea was voluntarily and knowingly entered.

At the post-conviction hearing, the petitioner gave his reasons for deciding to accept the plea agreement:

> [Y]ou see, my Mom's real sick, you know. It's just like I already had a burden on her. And I didn't want to see my Momma pass because of me. So I thought I had done what was best for her, to keep my Momma still here. As long as I know I'm breathing, my Momma's breathing, things would still be all right. So that's why I took that time, thinking I'm going to be able to get out and be with my Momma and my sister and my kids again. But it dawned on me later on, down the road, this ain't what it's supposed to be.
>
> Q. So you were – you're stating, then, that you were under the influence of your Mother's, not only mental, but her physical state that, in order to spare her, you accepted the sentence.
>
> A. Yes.

Although the petitioner denied making the decision to plea, he could not say who made the decision for him and stated that his attorneys did not coerce him into pleading guilty. The post-conviction judge apparently accredited the testimony of Dean that he and the other members of the defense team had carefully discussed the plea agreement and the waiver form with the petitioner before he signed them. It appears that the petitioner voluntarily pled guilty to avoid a possible life without parole sentence but now thinks he should have gotten a better deal. However, the entry of a guilty plea to avoid the risk of greater punishment does not make a plea involuntary. Hicks, 983 S.W.2d at 248. After considering the options available to him by going to trial and its effects on the health of his mother, the petitioner concluded that the only intelligent choice for him was to plead guilty to second degree murder in order to avoid the trial and the possibility of life without parole. We find nothing in the evidence that shows that this plea was improperly coerced or improperly entered, and, therefore, hold that the trial court did not err in denying the petitioner's post-conviction petition on this issue.

## II.
## Ineffective Assistance of Counsel

The petitioner alleges that his counsel was ineffective, because they failed to properly investigate witnesses for the defense and coerced his guilty plea through his family. We have already found no evidence that the plea was coerced by the petitioner's attorneys, and, therefore, will only address the allegation dealing with trial preparation. After a careful review of the record, we conclude that the petitioner's attorneys acted reasonably under the circumstances and affirm the trial court's denial of post-conviction relief on this issue.

When ineffective assistance of counsel is alleged, a convicted defendant must show two things before a reversal of his conviction is required: (1) that counsel's performance was deficient; and (2) that such deficient performance prejudiced the defendant. Strickland v. Washington, 466 U.S. 686, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); State v. Burns, 6 S.W.3d 453 (Tenn. 1999). To prove deficient performance of counsel, the defendant must show that counsel made such serious errors that he or she was not functioning as counsel envisioned by the Sixth Amendment. Id. This inquiry focuses on whether counsel's assistance was reasonable under the circumstances and is treated very deferentially by the court. Id., 466 U.S. at 688-89, 104 S. Ct. at 2065. There is a strong presumption on appeal that counsel's conduct falls within the range of reasonable professional performance, and we must evaluate counsel's performance from his or her perspective at the time of the alleged error in the context of the totality of the circumstances. Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App.), perm. app. denied (Tenn. 1998). In Tennessee, the evidence showing that an attorney failed to prepare a sound defense or to present witnesses must be substantial before ineffective assistance of counsel will be found. Id.

To prove prejudice, the defendant must show that counsel's errors were so serious that he was deprived of a fair trial. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, even if error occurred by counsel, a conviction is not to be set aside if the error had no effect on the outcome of the trial. Id., 466 U.S. at 691, 104 S. Ct. at 2066. When a guilty plea is involved, as in the present case, the defendant must show prejudice by establishing that he would not have plead guilty and would have insisted on going to trial "but for" his counsel's errors. Hicks, 983 S.W.2d at 246.

Our review of the record indicates that the petitioner's attorneys were effective advocates. The defense team consisted of three attorneys, one of whom was the elected public defender, an investigator, and a law clerk, all of whom put in many hours of preparation on this case. The team interviewed witnesses, reviewed reports, checked into the petitioner's background and family history, and unsuccessfully pursued the petitioner's theory of self-defense. The petitioner's family was asked to meet with the team at least twice in an attempt to get information and witnesses' names that would be favorable to the petitioner. The testimony of eyewitnesses was damaging to the petitioner, and the likelihood that he would be convicted of first degree murder and given life without parole was substantial. When the prosecutor made his offer to the petitioner, the attorneys fully discussed the plea agreement and sentencing factors with the petitioner and gave him ample time to think about it. He had an additional three days to change his mind before the plea was actually entered. Arrangements were made for the petitioner to see and talk with his family before his plea was entered.

At the submission hearing, the petitioner answered in the affirmative each time the trial court questioned him as to whether he understood fully what he was doing and whether his attorneys had explained everything to him. He told the court that he did not have any questions about the plea and did not indicate to either the trial court or his attorneys that he did not understand the plea or felt coerced in any way. We conclude that the petitioner has not shown that his attorneys' performance was deficient or that he would have gone to trial but for their actions. Thus, we affirm the judgment of the trial court in denying the post-conviction petition on these grounds.

## CONCLUSION

Upon our review of the record, we conclude that the evidence does not preponderate against the trial court's findings that the petitioner's guilty plea was voluntarily and knowingly entered. Likewise, we conclude that the evidence does not preponderate against the trial court's findings that the petitioner's counsel was effective in preparing for trial and in the guilty plea phase. We, therefore, affirm the trial court's denial of the petitioner's petition for post-conviction relief.